Filed 9/19/24  P. v. Serrano CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>HENRY JOSUE SERRANO,<br><br>     Defendant and Appellant. | A168138<br><br>(Alameda County<br>Super. Ct. No. 20CR012718) |

Henry Josue Serrano is serving a sentence of 90 years to life for five counts of sex offenses committed against minors.  On appeal, Serrano raises several claims of error, all of which are unavailing.  We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Anne Doe was born in 2002.  When Anne was five or six years old, her mother began dating Serrano; they married in 2008.

*The Apartment Incidents*

In May 2009, Anne (then aged seven), her mother, and Serrano moved into a one-bedroom apartment.  At that apartment, Serrano began sexually assaulting Anne when she was approximately seven or eight years old.

During the first incident, Anne was washing her hands alone in the bathroom when Serrano went into the bathroom wearing only underwear, pressed his penis against her back, and rubbed against her.  He then took his

1

penis out and began masturbating before turning Anne around to face him and ejaculating on her shirt. Serrano told Anne not to tell her mother.

Anne nevertheless told her mother that Serrano rubbed against her in his underwear, touched himself, and that she saw his penis. Anne's mother became upset and confused because Serrano was a leader in their church, and they got into an argument. Anne's mother and Serrano argued more often but he remained in the apartment. Anne felt the acrimony was a result of her reporting the incident to her mother. She became scared of Serrano because he remained in the house even after she told her mother; she felt that no matter what he did, he would still be there.

At the apartment, Anne sometimes slept in the living room and sometimes slept on a mattress in her mother and Serrano's room. One night, Anne woke up with semen on her mouth and saw Serrano sitting at the edge of the bed smirking. Thereafter, and almost every time that Anne slept in the bedroom, she would wake up with semen already on her mouth or see Serrano sitting at the edge of his bed masturbating before placing his semen on her mouth. Serrano was quiet at night but told Anne during the day not to tell her mother and that it was " 'just between us.' " The pattern continued throughout the entire time they lived at the apartment.

After it had happened a couple of times, Anne told her mother. Anne's mother questioned Anne as to whether the substance could have been water; this made Anne feel hopeless and that her mother did not believe her.

*The Closet Incident*

In August 2011, when Anne was nine years old, the family moved into a house. Shortly after moving in, Anne, Serrano, and Serrano's sister were in separate rooms unpacking (Anne's mother was not home). When Serrano called for Anne from his and her mom's bedroom, she went to the room.

Serrano directed Anne to the closet by putting his hands on her arms (though not tightly) and guiding her to the closet as he told her to be quiet.

Serrano stood at the entrance of the closet with Anne inside. He touched her breasts, first over her clothing and then with skin-to-skin contact. Anne was scared but obeyed his command to stay quiet because she did not feel like she had a choice. Serrano then took his penis out of his pants and told Anne to touch it. She was confused, so he began masturbating and indicated for her to do the same motion to his penis. She complied. At some point, Anne stopped touching his penis and left the closet; he did not stop her from leaving.

Anne told Serrano's sister, who was in the back room of the house, that Serrano had touched her body and made her touch his body.[1] Serrano's sister said she would tell Anne's mother; Anne's mother never discussed it with Anne.

*The TV Incident*

Anne had her own bedroom in the house. Other than the main door, there were two other ways to enter her room. First, it was possible to climb through the attic and down into the closet in Anne's room. Second, there was a back door in her room that Serrano had installed; Anne could not lock the door from inside, and it was possible to access the back door through a crawl space under the house. Anne noticed a pattern emerge: if her mother thought Serrano was leaving, he would enter through the crawl space to the back door; if it was known that he was in the house, he would enter through the attic.

---

[1] Serrano's sister testified at trial that Anne did not disclose the closet incident to her.

One evening when Anne was 10 years old, she was watching TV on her bed when Serrano entered through the back door. Serrano stripped to his underwear and got on top of Anne before proceeding to touch her vagina. He also told her to touch his penis and she complied. Anne eventually got up and Serrano left.[2]

After the TV incident, Serrano went into Anne's room and touched her vagina almost daily until she was 14 years old. Serrano also began telling Anne that she would not see her mother or brother again if she told anyone, and that no one would believe her. Anne became depressed and started self-harming, including by cutting her wrists and thighs.

*The iPad Incident*

When Anne was 11 or 12 years old, Serrano entered her room one night through the back door while she was using her iPad. Serrano brought flavored lubricant with him and told her to smell and taste it. As had become routine, Serrano began touching Anne's body. He also showed her pornography on his phone that was stepfather/stepdaughter themed. Serrano then removed Anne's clothes and penetrated her vagina with his fingers.[3]

After the iPad incident, Serrano continued to show her pornographic videos with a stepfather/stepdaughter storyline. He also had Anne perform oral sex on him almost every subsequent time that he went into her room,

---

[2] Anne also testified that Serrano penetrated her with his fingers during the TV incident, but the jury was unable to reach a verdict on the related count of sex crime with a child by sexual penetration (count 3).

[3] Anne testified that during the iPad incident, Serrano also had her orally copulate him, had her masturbate him, and penetrated her vagina with his penis, but the jury was not able to reach a verdict as to the related counts of aggravated sexual assault by oral copulation (count 4), aggravated sexual assault by rape (count 6), or forcible lewd act with masturbation (count 8).

lasting until the sexual abuse stopped when she was 14 or 15 years old. Once she reached that age, she felt able to physically resist him.

*Anne's Disclosures*

Anne disclosed Serrano's abuse at various times throughout the yearslong incidents to varying degrees. As noted above, Anne first told her mother when it began but did not feel believed when she did so. When Anne was eight or nine years old, she told the mother of one of her friends that Serrano had touched her on her breasts and vagina. The friend's mother told Anne's mother but did not follow up further.

When Anne was 10 years old, she told a therapist she had seen Serrano walking around naked and touching himself; she did not disclose that he was sexually abusing her because she was scared that she would be taken away from her mother. Anne then spoke to a child welfare worker at child protective services (CPS) but did not disclose any sexual abuse by Serrano because she was scared. After investigating, the CPS worker concluded Serrano had walked around naked but closed the investigation as " 'unfounded.' " Anne had another interaction with CPS at age 12 after reporting a physical altercation with Serrano, but did not disclose any sexual abuse as it had not been taken seriously during previous disclosures. When she was 14, Anne told a friend at school that Serrano had sexually abused her.

Ultimately, when Anne was 15 years old, she told her mother in detail about all the sexual abuse that had occurred. Anne's mother broke down and apologized. Serrano was no longer with Anne's mother at that time but was still living in a back room of the house, which made Anne feel uncomfortable. Anne's mother tried to get Serrano to move out; he left a few months later after she obtained a restraining order against him.

In 2020, when Anne was 18 years old, she reported the abuse to police. As a result, a felony complaint was filed alleging Serrano committed continuous sexual abuse of a child under the age of 14 (Pen. Code, § 288.5, subd. (a)).[4] Serrano was arrested in October 2020 and released on bail the following month.

*Assault of Zoe Doe*

After his release on bail in November 2020, and until March 2021, Serrano lived with his cousin and her two daughters. One of the daughters, Zoe Doe, was eight years old when Serrano lived there.

Serrano twice made Zoe feel uncomfortable while he was living with her. In the first instance, Serrano told Zoe to sit on his lap when they were alone in the kitchen and she obliged. While Zoe was sitting on his lap, she could feel Serrano's body "bouncing" underneath her and he sounded as if he was running or out of breath. Zoe felt Serrano's "private part" on her "private part" for about 10 minutes. She then got off his lap and left.

In the second instance, Zoe, her sister, and Serrano were sitting on the couch together. Zoe and Serrano were under the same blanket and Zoe fell asleep. She awoke to the feeling of Serrano's hands on her butt underneath her clothing while the two were still under the blanket. Zoe felt Serrano squeeze her butt about two times. She felt uncomfortable and left.

Zoe later told her sister about these two instances, who told their mother. Zoe's mother discussed the matter with Zoe directly and made Serrano move out.[5]

---

[4] All further statutory references are to the Penal Code.

[5] Zoe's sister testified at trial that Serrano had showed her pornographic videos on his phone, but the jury was unable to reach a verdict on the related count of sending harmful material to a minor with sexual intent (count 12).

6

*Charges, Trial, and Sentencing*

In 2023, a second amended information was filed charging Serrano with 12 counts of child sex offenses based on the incidents involving Anne, Zoe, and Zoe's sister.[6] The information also alleged numerous aggravating factors; as relevant to this appeal, it alleged as to all counts that the victims were particularly vulnerable (Cal. Rules of Court, Rule 4.421(a)(3)) and that Serrano took advantage of a position of trust or confidence (Cal. Rules of Court, Rule 4.421(a)(11)).

A jury trial took place in March 2023.

The prosecution presented the testimony of several witnesses, including Anne, Anne's mother, Zoe, and Zoe's mother, consistent with the above factual summary. The prosecution further presented the testimony of Dr. Blake Carmichael, an expert in child sexual abuse and child trauma, to help understand misconceptions of, and responses to, child sexual abuse, but he did not have any information about this specific case. This is generally

---

[6] Counts 1 through 10 concerned Anne and alleged: continuous sexual abuse of a child under the age of 14 (§ 288.5, subd. (a)) (count 1); forcible lewd act upon a child under the age of 14 (§ 288, subd. (b)(1)) during the closet incident (count 2); sex crime with a child 10 years of age or younger (§ 288.7, subd. (b)) during the TV incident (count 3); aggravated sexual assault on a child under the age of 14 by oral copulation (§ 269, subd. (a)(4)) during the iPad incident (count 4); aggravated sexual assault of a child under the age of 14 by sexual penetration (§ 269, subd. (a)(5)) during the iPad incident (count 5); aggravated sexual assault of a child under the age of 14 by rape (§ 269, subd. (a)(1)) during the iPad incident (count 6); two counts of forcible lewd act upon a child under the age of 14 (§ 288, subd. (b)(1)) during the iPad incident (counts 7 & 8); aggravated sexual assault of a child under the age of 14 by oral copulation (§ 269, subd. (a)(4)) (count 9); and forcible rape of a minor (§ 261, subd. (a)(2)) (count 10).

Count 11 concerned Zoe and alleged a lewd act upon a child under the age of 14 (§ 288, subd. (a)). Count 12 concerned Zoe's sister and alleged sending harmful material to a minor with sexual intent (§ 288.2, subd. (a)(2)).

referred to as child sexual abuse accommodation syndrome (CSAAS) evidence.[7]

The defense case sought to undercut Anne's credibility. For example, when cross-examining her, defense counsel asked multiple questions concerning her delayed or partial disclosure of various instances of abuse by Serrano. Defense counsel also questioned why Anne would not sleep in a different location during the abuse at the apartment. And the defense solicited testimony from Serrano's sister that Anne did not disclose the closet incident to her (contrary to Anne's testimony).

The jury returned a guilty verdict on five counts: count 1, continuous sexual abuse of a child (Anne) under the age of 14 (§ 288.5, subd. (a)); count 2, forcible lewd act upon a child (Anne) under the age of 14 (§ 288, subd. (b)(1)) during the closet incident; count 5, aggravated sexual assault of a child (Anne) under the age of 14 by sexual penetration (§ 269, subd. (a)(5)) during the iPad incident; count 7, forcible lewd act upon a child (Anne) under the age of 14 (§ 288, subd. (b)(1)) during the iPad incident; and count 11, lewd act upon a child (Zoe) under the age of 14 (§ 288, subd. (a)). As to each of those counts, the jury also found true that the victim was particularly vulnerable, and that Serrano took advantage of a position of trust or confidence.

Count 9 had been dismissed on motion of the prosecution during trial. The jury was unable to reach a verdict as to the remaining counts, and the court declared a mistrial as to those counts.

---

[7] Dr. Carmichael did not refer to CSAAS by name, in compliance with the trial court's pretrial ruling—over Serrano's objection—that the prosecution could admit testimony from a CSAAS expert, but the witness could not use the word "syndrome" or refer to CSAAS by abbreviation or by its full title. For ease of comprehension, we refer to Dr. Carmichael's testimony as CSAAS testimony or evidence throughout this opinion.

On May 26, 2023, the trial court sentenced Serrano to 90 years to life in prison, consisting of 15 years to life on count 1; a concurrent term of 15 years to life on count 5; and consecutive terms of 25 years to life each on counts 2, 7, and 11. Serrano appealed.

## DISCUSSION

Serrano challenges his convictions and sentence on various grounds. First, he raises multiple claims of error related to the CSAAS evidence at trial. Second, he asserts the court erred by failing to instruct the jury on a lesser included offense as to count 2. Third, he raises two claims related to the aggravating factors noted above. Finally, he asserts cumulative prejudicial error. Unpersuaded, we shall affirm.

## I. CSAAS Evidence Claims Are Unavailing

Serrano raises three claims related to the CSAAS testimony at trial: (1) Dr. Carmichael's testimony exceeded the bounds of permissible CSAAS testimony; (2) defense counsel was ineffective in failing to object to the prosecution's use of CSAAS testimony during closing arguments; and (3) the jury instruction given by the court in relation to CSAAS evidence, CALCRIM No. 1193, was an incorrect statement of the law.

CSAAS testimony has long been "admissible to rehabilitate [a child] witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 (*McAlpin*).) " 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*Id.* at p. 1301.) "The testimony is pertinent and admissible if an

9

issue has been raised as to the victim's credibility." (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1745 (*Patino*).)

However, CSAAS testimony "is not admissible to prove that the complaining witness has in fact been sexually abused." (*McAlpin*, *supra*, 53 Cal.3d at p. 1300.) And, as the line between impermissible and permissible use of CSAAS testimony "is by no means a bright one, the better practice is to limit the expert's testimony to observations concerning the behavior of abused children as a class and to avoid testimony which recites either the facts of the case at trial or obviously similar facts." (*People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1383–1384, superseded on other grounds by CALJIC No. 10.41.) We review a trial court's decision to admit expert testimony for abuse of discretion. (*McAlpin*, *supra*, 53 Cal.3d at p. 1299.)

With these parameters in mind, we turn to Serrano's CSAAS claims.

## A. Dr. Carmichael's Testimony Was Not Improper

Serrano contends Dr. Carmichael's testimony went beyond the permissible bounds of CSAAS testimony in two ways: (1) by closely tracking the facts of this case; and (2) by discussing attributes of perpetrators of sexual abuse rather than victims as a class. Serrano further asserts these alleged errors rendered his trial fundamentally unfair, in violation of his right to due process. We disagree.

Dr. Carmichael testified that he had not received any information about this case, spoken about the facts with anyone, or reviewed any documents related to the case. He typically testified for the purpose of explaining myths and misconceptions about child victims of sexual abuse, but he was not there to provide any opinion as to whether the allegations in this case were true or false.

Dr. Carmichael explained there are five components to the common misconceptions of child victimization: (1) secrecy; (2) helplessness; (3) entrapment or accommodation; (4) delayed, unconvincing, or conflicted disclosure; (5) and recanting or retraction.

When describing the development of a relationship between a perpetrator and victim, Dr. Carmichael stated that a child may not recognize when touch becomes inappropriate because a perpetrator may "groom" a child by infusing inappropriate touch with otherwise common touch or desensitizing a child to nakedness, among other ways. When the prosecution asked if such conduct could influence a child's willingness to disclose the abuse, Dr. Carmichael testified it could delay disclosure because the child at first believes it is normal behavior.

In response to the prosecution's question as to whether there were myths surrounding the idea that abuse could not occur when another adult was present in the home, Dr. Carmichael testified that, contrary to what would be "comforting" to think, abuse can occur "under the covers or a blanket" when a parent is nearby.

When the prosecution asked if perpetrators in positions of authority in a child's life could include clergy or religious figures, Dr. Carmichael stated it could, as those figures are viewed as having power or authority over the child's beliefs or redemption. He further explained a child's willingness to disclose abuse could be affected if the child feels the perpetrator is an authority figure. Asked if a perpetrator's relationship with the victim's guardian or caregiver could add to the element of secrecy, Dr. Carmichael responded it could, for example, if the child felt that disclosing the abuse would cause negative consequences for the child's mother.

## 1. The Testimony Did Not Improperly Mirror This Case

We turn first to Serrano's assertion that Dr. Carmichael's testimony was improper on the basis that it was related to the facts of this case. As an initial matter, Serrano did not raise a specific and timely objection on this basis in the trial court and therefore forfeited this objection to the CSAAS testimony. (See *People v. Partida* (2005) 37 Cal.4th 428, 433–434.)

Even if it were not forfeited, the testimony did not improperly mirror the facts of this case. The prosecution's questions merely invited Dr. Carmichael to opine on aspects of CSAAS relevant to misconceptions and myths suggested by the evidence, in accordance with the requirements for CSAAS testimony. (See *People v. Bowker* (1988) 203 Cal.App.3d 385, 393–394 [to be admissible, CSAAS evidence must be "targeted to a specific 'myth' or 'misconception' suggested by the evidence"].) In the instances cited by Serrano, the myths concerned delayed disclosure due to being desensitized to nakedness; that abuse cannot occur when other adults are present; secrecy to avoid negatively affecting the family; and an unwillingness to disclose when the perpetrator is a religious authority figure. That Dr. Carmichael's testimony as to scenarios common among child victims also happened to occur in this case does not make either the questioning or his testimony improper.

Furthermore, as we discuss further below, the court correctly instructed the jury that Dr. Carmichael's testimony was not evidence that Serrano committed any of the charged offenses, and it could only be used in assessing the conduct and credibility of the victims, which further supports the conclusion that Dr. Carmichael's testimony did not exceed the bounds of permissible CSAAS evidence. (See *People v. Thomas* (2023) 14 Cal.5th 327,

382 [" 'Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions.' "].)

## 2. The Testimony Did Not Erroneously Focus on Perpetrators

Serrano further contends Dr. Carmichael's testimony in the above cited instances—in addition to his discussion of grooming, whether the child knows the perpetrator, and the role of the perpetrator in the family—erroneously commented on perpetrators rather than victims as a class.[8]

At trial, Serrano objected to Dr. Carmichael's testimony on the basis that it improperly focused on the conduct of perpetrators, including when he discussed "grooming," rather than the conduct of victims. While acknowledging the line between the two was not "easily defined," the court ruled the testimony was not improper, as it was "almost impossible to discuss the potential behavior of victims of sexual assault without discussing the behaviors of their perpetrators." The court found Dr. Carmichael's testimony sought to dispel certain myths about the behavior of sexual assault victims, which necessarily required referencing how those victims react to conduct by perpetrators. The court also concluded the testimony as to grooming sought to dispel the myth that a child was not sexually assaulted by explaining how a victim "can be desensitized to certain behavior in some gradual way as a phenomenon that could only be accomplished by someone known to them who has regular access to them," and properly focused on how children react to that "increasingly invasive conduct."

The trial court did not abuse its discretion in admitting the challenged testimony after Anne's credibility was called into question by the defense.

---

[8] Serrano also points to testimony about "the gender of the perpetrator," but the record does not show Dr. Carmichael reached that topic.

13

(See *Patino*, *supra*, 26 Cal.App.4th at p. 1745 [CSAAS testimony is pertinent and admissible when issue raised as to victim's credibility].) To the extent Dr. Carmichael testified as to the behavior of perpetrators, grooming, and the relationship between a victim and perpetrator, it served as context to help explain how a child victim might react to such behavior. In particular, he explained that these factors could discourage disclosure because the child believes the behavior is normal or fears negative repercussions from reporting abuse by a family member or authority figure. This was properly limited to "observations concerning the behavior of abused children as a class" and therefore did not exceed the bounds of permissible CSAAS testimony. (See *People v. Gilbert*, *supra*, 5 Cal.App.4th at p. 1384.)

As there was no error in admitting the challenged CSAAS testimony after the defense placed Anne's credibility at issue, and the testimony was properly limited, we reject Serrano's assertion that it rendered his trial fundamentally unfair. (See *Patino*, *supra*, 26 Cal.App.4th at p. 1747 ["Appellant has failed to demonstrate how his fundamental right to a fair trial was violated by the introduction of CSAAS testimony to rehabilitate [the victim's] testimony . . . ."].)

## B. The Record on Appeal Does Not Show Defense Counsel Was Ineffective in Failing to Object to the Prosecution's Use of CSAAS Testimony During Closing Arguments

Serrano avers defense counsel provided ineffective assistance by failing to object to the prosecution's use of CSAAS testimony during closing arguments, which he asserts improperly used the testimony as evidence that Anne was telling the truth on the basis that she exhibited behaviors associated with CSAAS. He further asserts the claim can be reviewed based

14

on the appellate record alone as there is no satisfactory reason for counsel's failure to object.[9]

During the prosecution's closing argument, it repeatedly referenced Dr. Carmichael's testimony as to responses of child victims to sexual abuse in ways that were relevant to the evidence at trial showing how the victims in this case reacted to being abused. For example, the prosecution cited Dr. Carmichael's testimony regarding a child victim's unwillingness to disclose the abuse due to the fear of negative consequences, helplessness, self-blame, or the perpetrator's role as an authority figure.

In the defense's closing argument, counsel asserted that the prosecution had relied on Dr. Carmichael's testimony to try to "fill . . . holes" in the prosecution's case: "I counted . . . 25 times maybe during the [closing] argument . . . when the prosecutor said, 'as Dr. Carmichael said', 'Dr. Carmichael's testimony explains this.' Every time there's a problem it's like Dr. Carmichael was the calvary coming in and filling in all the problems they have with their case."

When challenging a conviction based on ineffective assistance, a defendant must show both that counsel's performance was deficient by falling below an objective standard of reasonableness under prevailing professional norms and resulting prejudice. (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

---

[9] We note that defense counsel objected to one instance in which the prosecution referenced Dr. Carmichael's testimony, and the trial court sustained the objection and instructed the jury as to the proper limits of the testimony. However, Serrano does not raise an independent claim of prosecutorial misconduct and instead bases his argument solely on defense counsel's failure to object to 13 other instances when the prosecution referenced Dr. Carmichael's testimony. Accordingly, we do not address whether the prosecution committed misconduct, nor the Attorney General's assertion that Serrano forfeited that claim.

When reviewing claims of ineffective assistance, we defer to counsel's reasonable tactical decisions and presume counsel acted within the wide range of reasonable professional assistance. (*Ibid.*)

"[E]xcept in those rare instances where there is no conceivable tactical purpose for counsel's actions, claims of ineffective assistance of counsel should be raised on habeas corpus, not on direct appeal. [Citation.] This is particularly true where, as here, the alleged incompetence stems from counsel's failure to object. '[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.' " (*People v. Lopez* (2008) 42 Cal.4th 960, 972 (*Lopez*).)

We conclude it is not appropriate to reach the merits of Serrano's ineffective assistance claim on direct appeal because, even assuming, *arguendo*, the prosecution misused Dr. Carmichael's testimony, this is not one of "those rare instances where there is no conceivable tactical purpose for counsel's" failure to object. (See *Lopez, supra*, 42 Cal.4th at p. 972.) Rather, as the Attorney General points out, defense counsel could have had tactical reasons for not objecting to the prosecution's use of Dr. Carmichael's testimony. For instance, defense counsel could have made a tactical choice not to object so that he could argue in his own closing argument—as he did—that the prosecution's case was full of holes that could only be filled by relying on Dr. Carmichael's testimony. Defense counsel could have also decided not to object to avoid calling extra attention to Dr. Carmichael's testimony.

In light of these conceivable tactical reasons for defense counsel to not object, and the lack of any affirmative explanation in the record as to why counsel failed to do so, Serrano's ineffective assistance claim should be raised,

16

if at all, on habeas corpus and not on direct appeal. (See *Lopez*, *supra*, 42 Cal.4th at p. 972.)

## C. The Court Did Not Err in Instructing the Jury with CALCRIM No. 1193

Serrano next contends the trial court erred by instructing the jury with CALCRIM No. 1193. He asserts the instruction as given contained ambiguous language that allowed the jury to misuse the CSAAS evidence to determine whether the claims of sexual abuse were true. We find no error in the jury instruction.[10]

"We review a claim of instructional error de novo. [Citation.] The challenged instruction is considered 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 326.)

The court instructed the jury pursuant to CALCRIM No. 1193 regarding Dr. Carmichael's testimony as follows:

> You have heard testimony from Dr. Blake Carmichael. His testimony is not evidence that the defendant committed any of the crimes charged against him or any conduct or crimes with which he was not charged.
> You may consider this evidence only in deciding whether or not [the victims'] conduct was not inconsistent with the conduct of

---

[10] In an apparent acknowledgement that he did not object to the CALCRIM No. 1193 instruction below, Serrano asserts he did not forfeit this claim as the alleged error affected his substantial rights. (§ 1259.) Here, "[w]e need not decide whether forfeiture applies . . . because the trial court did not err in giving CALCRIM No. 1193." (*People v. Ramirez* (2023) 98 Cal.App.5th 175, 219 (*Ramirez*).)

someone who has been a victim of a sexual offense, and in evaluating the believability of their testimony.[11]

Serrano asserts the second paragraph creates ambiguity and allows a jury to apply CSAAS evidence as circumstantial evidence of guilt, pointing to its use of a double negative (i.e., "not inconsistent with"). As an initial matter, and as Serrano concedes, numerous courts have concluded this version of CALCRIM No. 1193 does not result in a misuse of CSAAS evidence. (See, e.g., *Ramirez*, *supra*, 98 Cal.App.5th at p. 220 [instruction correctly informs the jury of the permissible and impermissible uses of CSAAS testimony]; *People v. Lapenias* (2021) 67 Cal.App.5th 162, 175–176 [instruction accurately instructs the jury on the law as to proper use and limitations of CSAAS evidence].) We agree with those courts.[12]

Further, and contrary to Serrano's contention, the use of a double negative does not create a reasonable likelihood that the jury misread the instruction by "invit[ing] the jury to . . . make their own armchair diagnosis of whether the symptoms of CSAAS prove the witness was abused." Rather, in the sentence preceding the challenged portion of CALCRIM No. 1193, the court explicitly instructed the jury that Dr. Carmichael's testimony could *not* be used for that purpose. The court also instructed the jury to consider

---

[11] CALCRIM No. 1193 was revised in September 2022, but the trial court provided the previous version of the instruction, modified from that version only to remove references to CSAAS by name.

[12] We likewise readily dispose of Serrano's assertion that CALCRIM No. 1193 violates due process by lessening the prosecution's burden of proof. (See *Ramirez*, *supra*, 98 Cal.App.5th at pp. 219–220 [instruction does not violate due process]; *People v. Gonzales* (2017) 16 Cal.App.5th 494, 504 [instruction does not lighten prosecution's burden of proof or violate due process].)

evidence that had been admitted for a limited purpose "only for that purpose and for no other." And, as previously noted, we presume the jury was able to understand and correlate instructions and followed the instructions given. (*People v. Thomas*, *supra*, 14 Cal.5th at p. 382.)

Given the court's advisement that the jury was not to consider the CSAAS testimony for any improper purpose, we conclude there is not a reasonable likelihood the jury applied CALCRIM No. 1193 in an impermissible manner. (See *People v. Rivera*, *supra*, 7 Cal.5th at p. 326.)

## II. The Failure to Instruct the Jury on a Lesser Included Offense for Count 2 Was Not Prejudicial

Serrano contends the trial court erred in failing to instruct the jury on the lesser included offense of lewd act on a child (§ 288, subd. (a)) with regard to count 2, forcible lewd act upon a child (§ 288, subd. (b)(1)), relating to the closet incident. (See *People v. Ward* (1986) 188 Cal.App.3d 459, 472 [section 288, subdivision (a), is a lesser or necessarily included offense of section 288, subdivision (b)].) He further asserts there is a reasonable probability he would have been convicted of the lesser offense had the jury been so instructed. We find no prejudicial error occurred.

A trial court has a sua sponte duty to instruct the jury on lesser included offenses when there is " 'substantial evidence' " from which a rational jury could conclude that the defendant committed the lesser offense, but not the greater offense. (*People v. DePriest* (2007) 42 Cal.4th 1, 50; see *People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*), disapproved of on other grounds by *People v. Schuller* (2023) 15 Cal.5th 237.)

Generally, and as relevant here, the failure to instruct on lesser included offenses in a noncapital case is an error of state law and is therefore "not subject to reversal unless an examination of the entire record establishes

19

a reasonable probability that the error affected the outcome." (*Breverman*, *supra*, 19 Cal.4th at p. 165; see *People v. Schuller*, *supra*, 15 Cal.5th at p. 260.) We may "consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*Breverman*, *supra*, 19 Cal.4th at p. 177.)

The only additional element a jury is required to find to convict a defendant of forcible lewd act upon a child (§ 288, subd. (b)(1)), as opposed to nonforcible lewd act on a child (§ 288, subd. (a)), is that, "[i]n committing the act, the defendant used force, violence, duress, menace, or fear of immediate and unlawful bodily injury to the child or someone else." (Compare CALCRIM No. 1111 with CALCRIM No. 1110.) The prosecution's theory of the case as to count 2 was that this additional element was satisfied primarily because Serrano used "duress" during the closet incident.[13]

To evaluate duress, we consider "[t]he totality of the circumstances includ[ing] the victim's age, her relationship to the perpetrator, threats to harm the victim, physically controlling the victim when the victim attempts to resist, warnings to the victim that revealing the molestation would result in jeopardizing the family, and the relative physical vulnerability of the child." (*People v. Thomas* (2017) 15 Cal.App.5th 1063, 1072.) "When the

---

[13] The trial court instructed the jury pursuant to CALCRIM No. 1111: "Duress means the use of a direct or implied threat of force, violence, danger, hardship, or retribution sufficient to cause a reasonable person to do or submit to something that he or she would not otherwise do or submit to. When deciding whether the act was accomplished by duress, consider all the circumstances, including the age of the child and her relationship to the defendant."

victim is young and is molested by her father in the family home, duress will be present in all but the rarest cases." (*Id*. at pp. 1072–1073.)

Here, there is no reasonable probability that the jury would have convicted Serrano of only the lesser included offense of lewd act on a child, as the evidence showing Serrano used duress in the commission of the closet incident was so relatively strong, and the evidence that he did not use duress was so comparatively weak. (See *Breverman, supra*, 19 Cal.4th at p. 177.)

At trial, Anne testified that Serrano "directed" her to the closet by putting his hands on her arms and guiding her to the closet while telling her to be quiet. Anne did not feel like she had a choice but to go to the closet. Once she was inside, Serrano stood in front of the entrance to the closet and proceeded to touch her breasts before telling her to touch his penis. Anne stated she was scared and felt she did not have a choice but to follow his command to stay quiet, explaining: "[Serrano] was bigger than me, heavier than me, and based on what had happened before, I kind of already pictured what the outcome would be if I did speak up, if I didn't stay quiet. So I felt like it was just best for me to stay quiet in the moment." She also testified Serrano felt like an authority figure to her at that time.

The totality of the circumstances strongly support the jury's finding that Serrano used duress in committing count 2, including Anne's age at the time (nine years old); her relationship to Serrano as his stepdaughter who viewed him as an authority figure; her relative physical vulnerability given that he was heavier and bigger than her; and her understanding from past experience that disclosing the abuse would result in Serrano and her mother fighting more, thereby jeopardizing the family. (See *People v. Thomas*, *supra*, 15 Cal.App.5th at p. 1072.)

21

Comparatively, there was little evidence supporting a finding that the offense was committed without duress. Serrano points only to Anne's testimony that he did not *tightly* grab her when directing her to the closet and that he did not use force to stop her from leaving the closet after the sexual abuse occurred. We therefore readily conclude that—even assuming, *arguendo*, the court should have instructed the jury as to the lesser included offense—there is no reasonable probability the outcome would have been different. (See *Breverman*, *supra*, 19 Cal.4th at p. 177.) Accordingly, reversal as to count 2 is not warranted. (See *id*. at p. 165.)

## III. Claims Relating to the Aggravating Factors Are Without Merit

Serrano raises two challenges related to the aggravating factors found true by the jury. First, he asserts there was insufficient evidence to show the victims were particularly vulnerable. Second, he contends resentencing as to count 11 (lewd act upon Zoe) is warranted because the jury instructions improperly allowed the jury to use the same facts used to establish the element of duress in some counts to also find two aggravating factors true. Serrano is incorrect on both bases.

### A. Substantial Evidence Supports the Vulnerable Victim Aggravating Factors

Serrano argues the evidence was insufficient to prove Anne and Zoe were particularly vulnerable victims, as there was no evidence that his conduct was distinctly worse than an ordinary commission of the offenses. He asserts that, to make that determination, the prosecution needed to present evidence of what would constitute an average commission of the crime. This claim is without merit.[14]

---

[14] As we conclude there was no error on this basis, we do not reach Serrano's assertion that the alleged error prejudiced him at sentencing.

"The standard of appellate review for determining the sufficiency of the evidence is settled. ' "On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Wilson* (2008) 44 Cal.4th 758, 806.) We presume every fact in support of the judgment the jury could have reasonably deduced from the evidence. (*Ibid.*)

For purposes of the particularly vulnerable victim factor, " ' "[p]articularly . . . means in a special or unusual degree, to an extent greater than in other cases," ' " and " ' "[v]ulnerability means defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the defendant's criminal act." ' " (*People v. DeHoyos* (2013) 57 Cal.4th 79, 154 (*DeHoyos*).) A victim can be deemed particularly vulnerable " 'for reasons not based solely on age, including the victim's relationship with the defendant.' " (*Ibid.*)

Presuming every fact in support of the jury's findings, we conclude that—even without the introduction of evidence of an average commission of the offenses—a reasonable jury could have found that Anne and Zoe were unprotected, accessible, and susceptible to Serrano's acts to a special and unusual degree. (See *DeHoyos, supra,* 57 Cal.4th at p. 154; *People v. Wilson, supra,* 44 Cal.4th at p. 806.)

The evidence showed that Serrano, her stepfather, abused Anne beginning when she was seven or eight years old; that Serrano installed a door to her bedroom at the house that she could not lock; and that he regularly abused her after entering her room by accessing the crawl space or the attic. Zoe was eight years old when she was sexually assaulted by

23

Serrano, her mother's cousin who was living with her at the time. Even considering that the offenses require conduct with victims under the age of 14, Anne and Zoe were particularly young, nowhere near 14, when they were abused by Serrano. Further, they each lived with Serrano, a family member whom their mothers trusted, at the time of the abuse. On this record, there was substantial evidence supporting the jury's findings that Anne and Zoe were vulnerable victims. (See *DeHoyos*, *supra*, 57 Cal.4th at p. 154; see also *People v. Garcia* (1985) 166 Cal.App.3d 1056, 1070 [victim's extreme youth coupled with close relationship to the defendant supports finding of vulnerability].)

## B. Resentencing on Count 11 Is Not Warranted

Serrano avers resentencing on count 11 (lewd act upon Zoe) is required on the basis that the jury instructions on two aggravating factors (vulnerable victims and taking advantage of a position of trust) improperly permitted the jury to use same facts to establish the aggravating factors and the element of duress in counts 2 and 7 (forcible lewd acts upon Anne) and count 5 (aggravated sexual assault upon Anne). He asserts the court "may have" set the sentence for count 11 to run concurrent to the other sentences, rather than consecutive, without the presence of these aggravating factors. We are not persuaded.

As an initial matter, Serrano does not assert that the jury improperly used the same facts to find the aggravating factors as any element of count 11, which is the sole count on which he argues the aggravating factors affected the sentence.

In any event, the record does not support his contention that, absent those two aggravating factors, the court may have imposed a concurrent sentence on count 11. Instead, when the court imposed the sentence on count

24

11, it explained its reasoning as to imposing a consecutive sentence as follows:

> And finally we have Count Eleven which . . . requires a term of 25 to life. I think here there is no requirement or even arguable requirement that the Court is required to impose this sentence consecutively. However, in light of the fact that it is a separate victim clearly separate occasion then the Court is finding that it will impose that sentence consecutively to the term already established.

Hence, the record clearly demonstrates that the court's decision to impose the consecutive sentence on count 11 was not based on the presence of any aggravating factors, but rather on the fact that count 11 involved a separate victim (Zoe) and occurred on a separate occasion from the counts involving Anne. Remand for resentencing on count 11 is not warranted on this basis.

## IV. There Was No Cumulative Prejudicial Error

Finally, Serrano contends the cumulative effect of the above alleged errors prejudiced him, requiring reversal. As we have rejected all of Serrano's claims, we reject this contention as well. (See *People v. Bolin* (1998) 18 Cal.4th 297, 335.)

### DISPOSITION

The judgment is affirmed.

_____
Petrou, J.

WE CONCUR:


_____
Tucher, P. J.


_____
Fujisaki, J.

A168138/*People v. Serrano*